UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: December 1, 2014
```

------------------------------------------------------X
                          :

RICHARD KEITH,                   :

                            :

                  Plaintiff,     :        11 Civ. 3577 (KPF)

                            :

                  v.             :      <u>OPINION AND ORDER</u>

                            :

CITY OF NEW YORK, *et al.*,     :

                            :

                  Defendants. :

                            :
------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

On June 23, 2010, a woman was brutally raped in Brooklyn.[1]  Several weeks later, on July 9, 2010, the woman saw Plaintiff Richard Keith on a public street and identified him as the perpetrator of the rape.  Detectives from the New York City Police Department (the "NYPD") questioned Plaintiff at his home on July 12, 2010, and invited him to participate in a lineup later that day; when the victim again identified Plaintiff as her attacker during the lineup, he was arrested.  The next day, Plaintiff was arraigned on felony and misdemeanor sexual offense and robbery charges.  A few days later, on July 16, 2010, Plaintiff was released from custody after a DNA test exonerated him.

Plaintiff brought suit against the City of New York and NYPD Detective Jarret Brown; he later named additional NYPD personnel, Lieutenant Francis Morrissey and Detectives Evelyn Gutierrez, Elizabeth Murray, and Sarah Mathers.  Plaintiff alleged deprivation of his civil rights under 42 U.S.C. § 1983,

---

[1]      For privacy reasons, she is not identified in this Opinion.

as well as false arrest, malicious prosecution, failure to intervene, and *respondeat superior* under New York State law.

Defendants now move for summary judgment as to all of Plaintiff's claims. The Court grants the motion as to Plaintiff's federal and state false arrest and malicious prosecution claims, as well as his federal denial of fair trial claim, for the reasons discussed in this Opinion. Because Plaintiff has raised an issue of material fact as to the foreseeability of his assault while in custody, the Court denies the motion as to the state law failure to intervene and *respondeat superior* claims against the City of New York. However, because the Court declines to exercise supplemental jurisdiction, these state law claims are likewise dismissed.

## BACKGROUND[2]

### A.    Factual Background

#### 1.    The Sexual Assault

Early in the morning of June 23, 2010, a 61-year-old woman (the "Victim") was raped in an alleyway near her home in Brooklyn, New York. (Pl.

---

[2]    The facts set forth herein are drawn from Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Def. 56.1"); the Declaration of Barry Myrvold in Support of Defendants' Motion for Summary Judgment ("Myrvold Decl.") and the exhibits attached thereto; Plaintiff's Counter Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Pl. 56.1 Opp."); the Affirmation of David A. Zelman in Opposition to Defendants' Motion for Summary Judgment ("Zelman Aff.") and the exhibits attached thereto; the Affidavit of Richard Keith ("Plaintiff Aff."), which is on the record as Zelman Aff. Ex. J; Defendants' Response to Plaintiff's Rule 56.1 Statement and Reply to Plaintiff's Response ("Def. 56.1 Reply") and the deposition testimony of various witnesses ("[Name] Dep."). For convenience, Defendants' opening brief is referred to as "Def. Br.," Plaintiff's opposition brief as "Pl. Opp.," and Defendants' reply brief as "Def. Reply."

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by

56.1 Opp. ¶ 7; Pl. Br. 2).  The Victim did not know her attacker before the assault (Pl. 56.1 Opp. ¶ 8), and she did not get a good look at his facial features while being raped (*id.* at ¶ 9).

After the rape, the attacker took the Victim from the alleyway into her nearby apartment building and to the door of her apartment, demanding money.  (Pl. 56.1 Opp. ¶¶ 10-12; Pl. Br. 2).[3]  At some point during this sequence of events, the Victim did get a good look at her attacker.  (Def. 56.1 Reply ¶ 8; Victim Dep. 9).  Once at her front door, the Victim was able to escape into her apartment and close the door behind her.  (Pl. 56.1 Opp. ¶ 10). The Victim called out to her son for help, and her daughter called 911.  (Pl. Br. 2).  The attacker fled.

Police responded to the scene, and the Victim provided a description of her attacker that was included in the NYPD "Unusual Occurrence Report": "Male, Black, 6'2", 200 lbs, bald, dark skin . . . , big muscular, blue jeans, red/blk jacket, blk tee shirt, 30's."  (Zelman Aff. Ex. A at NYC 92).  The Victim was taken to the hospital where the medical examiner used a sexual assault kit to collect evidence, from which the examiner was able to obtain a DNA profile of the attacker.  (*Id.* at NYC 29).

---

the other party, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c)-(d).

[3]     The attacker threatened the Victim with a gun, but the Victim never actually saw a gun. (Pl. 56.1 Opp. ¶¶ 7, 12; Zelman Aff. Ex. A NYC 92).  Plaintiff alleges in the operative Complaint that the rape was at gunpoint.  (Second Amended Complaint ("SAC") ¶ 11). Whether there was a gun is immaterial to the resolution of this motion.

## 2.     The Investigation

Defendant Francis Morrissey, a sergeant in the Brooklyn Special Victims Squad (the "BSVS") with 19 years' experience, assigned the rape investigation to Defendant Jarret Brown, a detective in the BSVS with 16 years' experience. (Pl. 56.1 Opp. ¶¶ 1, 2, 14). [4]  On the day of the rape, Det. Brown conducted a follow-up interview of the Victim.  (Myrvold Decl. Ex. N at DEF 673-74).  The interview paperwork indicates that the Victim described the attacker as a 30-year-old black male, wearing jeans and a multi-colored jacket.  (*Id.*).  The Victim met later that day with an NYPD sketch artist, who prepared a sketch that described the attacker below the image as "MALE, BLACK, DARK COMPLEXION, APPROX. 40YRS. OLD, 6'0" TALL, APPROX. 200-220LBS., WEARING A BLACK AND RED JACKET[,] BLACK T-SHIRT, LIGHT BLUE JEANS." (Myrvold Decl. Ex. O at NYC 106).[5]

Thereafter, Det. Brown took the Victim to the BSVS offices at the 77th Precinct in Prospect Heights, where she viewed photographs that were selected based on her description of her attacker.  (Pl. 56.1 Opp. ¶ 19).  In his contemporaneous notes regarding the display of these photographs, Det. Brown wrote that the Victim "seemed to pay particular attention to an individual who is identified as Buster Singleton," and that she "state[d] that

---

[4]     References to Defendants' positions in, and years of service with, the NYPD are as of June 2010.

[5]     At her deposition, the Victim testified that she could not remember whether she provided a description to the sketch artist, but that while he was drawing "he wasn't speaking to [her] to ask her any question[s]" and, further, that the written descriptive information on the drawing did not come from her but from the police.  (Victim Dep. 13-14).

this individual looks just like the one who attacked her." (Pl. 56.1 Opp. ¶ 20; Myrvold Decl. Ex. N at DEF 680). The Victim did not identify Buster Singleton as the attacker, but she said he "looks a lot like" the attacker. (Pl. 56.1 Opp. ¶ 21; Brown Dep. 34).[6] At this point, Det. Brown designated Singleton, who had a criminal history and a previous arrest in the neighborhood of the rape, as a "person of interest" and filled out an NYPD Investigation Card (or "I-Card") indicating as much. (Pl. 56.1 Opp. ¶ 22).[7]

Singleton was not arrested based on the Victim's statement, but, when he was picked up later that month on an unrelated incident, Det. Brown was notified that Singleton was in custody. (Pl. 56.1 Opp. ¶ 23; Brown Dep. 34-36). Det. Brown interviewed Singleton and obtained a DNA sample from him with his consent. (Brown Dep. 35-36). A variety of factors, including Singleton's alibi, Singleton's reactions to questions, and Singleton's mannerisms, led Det. Brown to eliminate Singleton as a suspect in the rape. (Pl. 56.1 Opp. ¶ 23). Ultimately, the DNA test results would confirm this elimination. (Myrvold Decl. Ex. N at DEF 732).

On June 24, 2010, Det. Brown interviewed an eyewitness to the rape, Paul Thomas. (Pl. 56.1 Opp. ¶ 24).[8] At the time Thomas witnessed the rape,

---

[6]   Plaintiff makes contradictory claims regarding the Victim's "selection" of Buster Singleton that are unsupported by the record and, as such, do not raise an issue of material fact. These claims are discussed in more detail below.

[7]   An I-Card is "a device detectives use to notify patrol officers that a person is wanted for questioning either as a witness or suspect." *People* v. *Diaz*, 943 N.Y.S.2d 793 (Table), 2011 WL 7036350, at *1 (Sup. Ct. Bx. Cnty. Dec. 22, 2011).

[8]   Thomas came forward after learning from a neighborhood store owner that the police, who had identified him from the store's surveillance footage as a potential witness, wanted to speak to him. (Thomas Decl. ¶ 4).

he believed he was seeing "two people having consensual sex," noting that "[t]here was no screaming or crying out." (Thomas Decl. ¶ 2). Thomas told Det. Brown that he "did briefly see" the attacker and described him as "in shape but slim in physical appearance … possibly 6 to 6 ft 3 inches in height with a slim face, and dark skinned." (Myrvold Decl. Ex. N at DEF 717). Det. Brown took Thomas to the BSVS offices, where Thomas viewed a photograph array that had been assembled based on both his own and the Victim's descriptions of the attacker. (Pl. 56.1 Opp. ¶ 26). Thomas could not identify any individual pictured as the rapist. (*Id.*).

### 3. The Victim's First Identification of Plaintiff

On the morning of July 10, 2010, the Victim called Det. Brown, and told him either that she had seen her attacker, or that she had seen someone who "looked like" her attacker, walking in her neighborhood on the evening of July 9, 2010. (Pl. 56.1 Opp. ¶ 27).[9]  The Victim told Det. Brown that she had seen this individual in the company of a woman whom the Victim recognized from the neighborhood, but whose name she did not know. (Myrvold Decl. Ex. N at

---

[9]  Defendants assert that during this phone call the Victim "told Det. Brown that she 'saw her attacker' — it wasn't a maybe" (Def. 56.1 ¶ 28), while Plaintiff argues that the Victim told Brown only that she saw someone who "looked like" her attacker (Pl. 56.1 Opp. ¶ 28). Indeed, both positions find support in the record. Det. Brown has consistently characterized the identification as definite. For example, his contemporaneous notes of the phone call stated multiple times that the Victim "did see perp." (Myrvold Decl. Ex. N at DEF 725). And Det. Brown testified at his deposition that the Victim did not say she "may" have seen her attacker, but rather she "said she saw her attacker," and that it was not a "maybe." (Brown Dep. 55). However, the Victim herself provides inconsistent accounts. For example, the Victim testified, "I saw this person and I tell them, 'That person *looking like* him. That *looking like* him.' And that is over there." (Victim Dep. 27 (emphases added)). In the same breath, however, the Victim testified, "I tell them I *saw the person.* I *saw the person.* I saw somebody who *looked like* the person." (*Id.* at 39 (emphases added)). This Opinion will discuss the significance *vel non* of this ambiguity below.

DEF 725).  The Victim also told Det. Brown that she saw the individual enter a grocery store.  (*Id.*).  Det. Brown conducted further investigation, which included following up with the grocery store owner and obtaining surveillance video, and determined that the woman accompanying the individual the Victim saw was Kim Gorman.  (*Id.* at DEF 725-26).

At this point, Sgt. Morrissey asked Steven Litwin, another BSVS detective with 30 years' experience (Pl. 56.1 Opp. ¶ 6), to get involved with the investigation (Litwin Dep. 7-9).[10]  Sgt. Morrissey related to Det. Litwin that the Victim had seen a man — a man whom she claimed had recently raped her — in the company of a woman, Kim Gorman; Det. Litwin was tasked with locating and interviewing Gorman to determine who the man was.  (*Id.* at 7).

---

[10]    Plaintiff requests that the Court preclude Defendants from relying on Det. Litwin because Defendants initially failed to disclose him as a witness under Federal Rule of Civil Procedure 26(a).  (Pl. Opp. 29-32).  Defendants respond that they were not initially aware that Det. Litwin had any significant involvement and did not initially intend to call him as a witness.  Moreover, they contend, they disclosed documents early in the litigation indicating Det. Litwin's role: Plaintiff could have reviewed these documents and requested Det. Litwin's deposition earlier in the case.  (Def. Reply 6 n.5).

Where a party does not meet its discovery obligations, "[a] district court has wide discretion to impose sanctions, including severe sanctions, under Federal Rule of Civil Procedure 37."  *Design Strategy, Inc.* v. *Davis*, 469 F.3d 284, 294 (2d Cir. 2006).  Pursuant to Rule 37(c)(1), if a party fails to provide information required by Rule 26(a), the party generally is not permitted to use that information at trial "unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); *see also Agence France Presse* v. *Morel*, 293 F.R.D. 682, 685 (S.D.N.Y. 2013).  In determining whether to exclude evidence under this standard, a district court considers a nonexclusive list of four factors: (i) the party's explanation for its failure to disclose, (ii) the importance of the evidence, (iii) the prejudice suffered by the opposing party, and (iv) the possibility of a continuance.  *See Design Strategy*, 469 F.3d at 296 (citing *Patterson* v. *Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)).

Having reviewed the parties' positions in light of the relevant factors, the Court declines to preclude Defendants from relying on Det. Litwin's testimony.  Plaintiff was able to depose Det. Litwin, and thus, even assuming *arguendo* a violation of Rule 26, Plaintiff has not demonstrated prejudice sufficient to exclude his testimony.

On July 12, 2010, BSVS detectives, including Det. Litwin, canvassed the Victim's neighborhood, found Gorman, interviewed her, and determined that Plaintiff Richard Keith was the man whom the Victim had seen on the evening of July 9, 2010.  (Myrvold Decl. Ex. N at DEF 729; Pl. 56.1 Opp. ¶¶ 31-32). Later that afternoon, Det. Litwin and two other detectives went to Plaintiff's home, asked him questions, and went with him to the grocery store where he had been seen a few days prior.  (Pl. Opp. 56.1 ¶ 33).  Afterwards, Plaintiff went home and the detectives returned to the BSVS offices.  (*Id.*).  Det. Litwin testified that when he first met Plaintiff, he believed he had probable cause to arrest him based on the Victim's spontaneous identification; however, after speaking to Plaintiff, Det. Litwin did not think that Plaintiff was the rapist and so left without taking him into custody at that time.  (*Id.* at ¶ 59).

After leaving Plaintiff's home, Det. Litwin spoke with the Victim on the phone.  (Litwin Dep. 11).  The purpose of the call was to hear the specifics of the identification from the Victim, and to let her know that the police had identified the man she had seen with Gorman.  (*Id.*).  Det. Litwin summarized the phone call, in part, as follows:

> I asked her about the identification first and I asked her [] if she was sure that that was the person that had raped her.  And she said that she was.  I then asked her if there was any possibility that perhaps she had recognized him just from the neighborhood, that he may have been familiar to her from the neighborhood and may, in fact, not be the rapist.  And she said, "No, I [] recognized him as the person that attacked me," or whatever term she used. … I explained to her that we had identified the person and that he was her neighbor, and it appeared that possibly she could be confused and maybe she just recognized him from the neighborhood

> and not from the crime. ... I asked her specifically at
> that point, "Are you certain? [...] Could it be that you
> recognize him from the neighborhood and maybe you're
> a bit confused?"  And she said, "No, I recognize him []
> from the attack."  And then she added [] something to
> the effect of, if we had spoken to him and investigated
> and if we were confident that he was not the attacker,
> that she understood that.

(*Id.* at 12-13).  This last statement — that the Victim would be satisfied if the police investigated Plaintiff and determined he was not the perpetrator — gave Det. Litwin additional doubts about the Victim's certainty in her identification. (*Id.* at 14).

Det. Litwin later learned from Sgt. Morrissey that the Chief of the BSVS had ordered that Plaintiff be put into a lineup.  (Litwin Dep. 35-36).  Det. Litwin told Sgt. Morrissey that he had doubts about the Victim's identification.  (*Id.* at 37).  He then explained to another one of his superiors, Captain Joseph White, that he was "convinced" Plaintiff was not the rapist; that the Victim was confused; and that he did not believe Plaintiff should be put into a lineup.  (*Id.*). Capt. White disagreed with Det. Litwin, telling Det. Litwin that he had been "wrong to make the judgment in the street" after questioning Plaintiff; that "there was probable cause [to arrest Plaintiff] because of [the Victim's] prior statement to Detective Brown"; and that Plaintiff "should have been brought in initially," that is, earlier that day after Det. Litwin had first interviewed him. (*Id.* at 38).

Later in the evening of July 12, 2010, Sgt. Morrissey, along with Defendant Elizabeth Murray, a detective in the BSVS with seven years' experience (Pl. 56.1 Opp. ¶ 3), went to Plaintiff's home and asked him to come

to the BSVS offices in Prospect Heights to participate in a lineup (*id.* at ¶¶ 35-36).  Plaintiff agreed, and Sgt. Morrissey and Det. Murray took Plaintiff to the BSVS.  (*Id.* at ¶ 37).  After dropping him off, Sgt. Morrissey and Det. Murray picked up fillers for the lineup from a local homeless shelter.  (*Id.* at ¶ 40; Murray Dep. 15).  Meanwhile, Defendants Evelyn Gutierrez and Sarah Mathers, detectives in the BSVS with twenty and seven years' experience, respectively, picked up the Victim from her home and brought her to the BSVS for the lineup.  (Pl. 56.1 Opp. ¶¶ 4, 5, 42).

### 4.    The Victim's Second Identification of Plaintiff at the Lineup

Sgt. Morrissey and Det. Mathers conducted the lineup.  (Pl. 56.1 Opp. ¶ 41).  The lineup had five "fillers" in addition to Plaintiff.  (Myrvold Decl. Ex. P). These men: (i) were all African American; (ii) had ages of 26, 28, 35, 45, and 48; (iii) weighed 170, 165, 170, 200, and 175 pounds, respectively; and (iv) were either 5'10" or 5'11" in height.  (*Id.*; Keith Dep. 23).  During the lineup, the men wore the same white T-shirts and the same black baseball caps (Myrvold Decl. Ex. P; Keith Dep. 25); the men were all seated and held signs each bearing a number one through six (Myrvold Decl. Ex. P).

Det. Litwin spoke to the Victim prior to the lineup, emphasizing to her that it was "very important," and explaining that if she recognized someone, it was important for her to be sure that she recognized him from the crime, and not just from her neighborhood.  (Litwin Dep. 18).  He told her to be "very

careful" viewing the lineup.  (*Id.*; Pl. 56.1 Opp. ¶ 46).[11]  The Victim identified Plaintiff in the lineup as her attacker.  (Def. 56.1 Reply ¶ 48).

### 5.     Plaintiff's Arrest and Interactions with Fellow Prisoners

As a result of the identification, Det. Mathers processed Plaintiff's arrest that same evening, July 12, 2010, and he was taken into custody.  (Pl. 56.1 Opp. ¶ 50).  The arrest report described Plaintiff as a black male, 45 years old, 5'10" tall, 170 pounds in weight, bald, and having a medium skin tone.  (*Id.* at ¶ 51).  Plaintiff voluntarily provided a DNA sample.  (*Id.* at ¶ 55).  At some point, Det. Litwin called the Kings County District Attorney's Office and requested that the DNA testing be expedited.  (*See* Litwin Dep. 21-22 ("[I]n this type of case where somebody is sexually assaulted on the street by a stranger, it's a high priority case, and there's always a request made to expedite the testing of the rape kit, in the idea that maybe we could identify the rapist fairly quickly and prevent another crime.")).

The next day, on July 13, 2010, Det. Brown brought the Victim to the Kings County District Attorney's Office, where they met with a prosecutor.  (Pl. 56.1 Opp. ¶ 74).  The criminal complaint was prepared based on information provided by the Victim.  (*Id.* at ¶ 77; Myrvold Decl. Ex. R (Crim. Ct. Compl.)).  Det. Brown signed the criminal complaint, which contained a top charge of rape in the first degree in violation of New York Penal Law § 130.35(1).  (Pl.

---

[11]     Plaintiff purports to dispute this, claiming that the "victim testified that she did not speak to anyone before viewing the lineup," and citing a portion of the Victim's testimony.  (Pl. 56.1 Opp. ¶ 46).  However, as discussed in greater detail below, the portion of the Victim's testimony cited by Plaintiff does not actually dispute this fact.  It is therefore accepted as undisputed.

56.1 Opp. ¶ 77).  Plaintiff was arraigned on July 13, 2010, and remanded into custody on $100,000 bail.  (*Id.* at ¶ 78).

After the arraignment, Plaintiff suffered a panic attack and was sent to the hospital, where he received treatment for chest pain.  (Pl. 56.1 Opp. ¶ 84; Pl. Opp. 6).  Plaintiff claims that his lawyer requested that he be put into protective custody once taken to prison.  (Keith Dep. 34).  It is not clear from the record to whom this request was made, or who was aware of this request. When he returned from the hospital, Plaintiff was not placed in protective custody, but was placed in a cell with 20-25 other inmates in Central Booking. (Pl. 56.1 Opp. ¶ 84).  Because some of these inmates had been present in the courtroom during his arraignment, Plaintiff believed that the other prisoners knew he was charged with raping a 61-year-old woman.  (*Id.* at ¶ 87).  While in this cell, Plaintiff was assaulted by the other inmates.  (*Id.* at ¶ 84).  The assault lasted about two to three minutes, and Plaintiff was punched 10 to 20 times, before correction officers intervened to stop the assault and placed Plaintiff in a cell by himself.  (*Id.* at ¶ 85; Keith Dep. 34-35).  As a result of the assault, Plaintiff sustained a "knot" on his head, and testified that his body was sore from all of the punches.  (Pl. 56.1 Opp. ¶ 86).

Plaintiff suffered another incident during his transport to the Rikers Island Correctional Facility.  Plaintiff claims that he overheard a female corrections officer saying to another corrections officer that he (Plaintiff) should not be placed on the bus to Rikers Island with the prisoners who had already assaulted him.  (Keith Dep. 35).  According to Plaintiff, a male officer

handcuffed Plaintiff and put him on the bus before the other prisoners were loaded, in a cell at the front of the bus that was isolated from the seats in the back where the other prisoners would sit.  (*Id.*).  As the other prisoners boarded the bus, they verbally threatened and spit on Plaintiff.  (*Id.* at 35-36; Pl. 56.1 Opp. ¶ 88).[12]  When Plaintiff arrived at Rikers Island, he was placed in a cell by himself, although apparently the other prisoners could still see Plaintiff and continually taunted him as a purported rapist.  (Keith Dep. 36).

### 6.     Plaintiff Is Exonerated by DNA Evidence

On July 15, 2010, at about 4:30 p.m., Det. Brown, Det. Litwin, and the District Attorney's Office were informed that DNA testing identified Devon Lloyd as the rapist and excluded Plaintiff as the rapist.  (Pl. 56.1 Opp. ¶ 79).  Plaintiff was released from custody at approximately 2:35 a.m. on July 16, 2010.  (*Id.* at ¶ 82).  The prosecution against Plaintiff was dismissed on August 24, 2010. (*Id.* at ¶ 83).

## B.     Procedural Background

A notice of claim was filed on Plaintiff's behalf on July 30, 2010.  (Pl. 56.1 Opp. ¶ 91).  The Complaint in this action was filed on May 25, 2011, and a Second Amended Complaint (or "SAC") was filed on June 14, 2013.  (*Id.* at ¶¶ 92-93; Dkt. #1, 45).  All answers were filed by August 8, 2013.  (Dkt. #47,

---

[12]     Plaintiff concedes that Defendants Morrissey, Brown, Murray, Gutierrez, and Mathers were not physically present when Plaintiff was assaulted by his fellow prisoners.  (Pl. 56.1 Opp. ¶ 89).  Plaintiff has not identified any of the officers who were physically present when he was assaulted in Central Booking or while in transport to Rikers Island.  (*Id.* at ¶ 90).

54).  Pending before the Court is the Defendants' motion for summary

judgment, which was fully briefed as of April 25, 2014.  (Dkt. #73-76, 80-84).

## DISCUSSION

### A.    The Standard for Summary Judgment Motions

Under Federal Rule of Civil Procedure 56(a), summary judgment may be

granted only if all the submissions taken together "show that there is no

genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322

(1986); *see also Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating "the absence of a

genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is "material" if

it "might affect the outcome of the suit under the governing law," and is

genuinely in dispute "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also*

*Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing

*Anderson*).  The movant may discharge this burden by showing that the

nonmoving party has "fail[ed] to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party

will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; *see also*

*Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding

summary judgment appropriate where the non-moving party fails to "come

forth with evidence sufficient to permit a reasonable juror to return a verdict in

his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)); *see also Vargas* v. *Transeau*, 514 F. Supp. 2d 439, 442 (S.D.N.Y. 2007) (observing that "the mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to defeat summary judgment (internal quotation marks and citations omitted)), *aff'd sub nom. Vargas* v. *Pfizer, Inc.*, 352 F. App'x 458 (2d Cir. 2009) (summary order).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, in considering "what may reasonably inferred" from witness testimony, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (citing *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).

## B.    Analysis

### 1.    The Court Grants Summary Judgment as to Plaintiff's Federal and State False Arrest Claims

The parties dispute the timing of Plaintiff's arrest, and, by extension, the quantum of probable cause existing at the time of arrest. Defendants contend that probable cause for Plaintiff's arrest existed upon the first identification of him by the Victim. That said, Defendants argue that Plaintiff was not actually arrested until his formal arrest, after the Victim had identified Plaintiff a second time in a police-supervised lineup that provided even more probable cause. (Def. Br. 5-8; Def. Reply 1-2). Plaintiff responds that he was arrested prior to his formal arrest (or, at least, that a genuine issue of material fact exists in this regard), when Sgt. Morrissey and Det. Murray picked him up at his home and brought him to the BSVS offices for the lineup. He argues that this was a false arrest, undertaken without probable cause. (Pl. Opp. 9-11).

16

Even if that detention did not constitute a false arrest, Plaintiff argues in the alternative that when he was formally arrested on July 12, 2010, the NYPD still lacked probable cause.  (*Id.* at 11-15).  For the reasons set forth in the remainder of this section, the Court grants Defendant's summary judgment motion as to Plaintiff's federal and state false arrest claims.

### a.   Applicable Law

#### i.   Section 1983 Liability for False Arrests

Section 1983 establishes liability for deprivation, under the color of state law, "of any rights, privileges, or immunities secured by the Constitution."  42 U.S.C. § 1983.  Here, Plaintiff alleges Section 1983 claims for false arrest, malicious prosecution, and denial of fair trial, in addition to alleging the state law torts of false arrest and malicious prosecution.  (*Compare* SAC, First, Third, and Seventh Causes of Action, *with* SAC, Second and Fourth Causes of Action).

The elements necessary to prove false arrest under Section 1983 are "substantially the same" as the elements for false arrest under New York law, save for the requirement that the constitutional tort be committed under color of state law.  *Posr* v. *Doherty*, 944 F.2d 91, 96 (2d Cir. 1991) (quoting *Raysor* v. *Port Auth. of N.Y. and N.J.*, 768 F.2d 34, 39-40 (2d Cir. 1985)).  To establish a claim for false arrest, the plaintiff must show that: (i) he was intentionally confined; (ii) he was conscious of the confinement; (iii) he did not consent to the confinement; and (iv) the confinement was not privileged.  *Ackerson* v. *City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012); *accord Shain* v. *Ellison*, 273 F.3d 56, 67 (2d Cir. 2001).

### ii.    False Arrest and Probable Cause

A claim of false arrest under Section 1983 is rooted in the Fourth Amendment, which provides an individual with the right to not be arrested without probable cause.  *Weyant* v. *Okst*, 101 F.3d 845, 852 (2d Cir. 1996) ("A § 1983 claim for false arrest[] rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause.").  This means that a claim for false arrest cannot be established when the arresting officer had probable cause to make the arrest.  *Singer* v. *Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.").

It follows that "the existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether the action is brought under state law or under § 1983."  *Weyant*, 101 F.3d at 852; *see also Fulton* v. *Robinson*, 289 F.3d 188, 195 (2d Cir. 2002) ("A § 1983 claim of false arrest based on the Fourth Amendment right to be free from unreasonable seizures may not be maintained if there was probable cause for the arrest.").  "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  *Gonzales* v. *City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (quoting *Weyant*, 101 F.3d at 852).

"The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant*, 101 F.3d at 852; *see also Douglas* v. *City of New York*, 595 F. Supp. 2d 333, 340 (S.D.N.Y. 2009) ("The Second Circuit has held that a determination of whether probable cause to arrest existed may be made as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." (internal quotation marks omitted)).  When determining whether probable cause exists to arrest, a court "must consider those facts available to the officer at the time of the arrest and immediately before it." *Lowth* v. *Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996).  "A court examines each piece of evidence and considers its probative value, and then 'look[s] to the totality of the circumstances' to evaluate whether there was probable cause to arrest and prosecute." *Stansbury* v. *Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (quoting *Panetta* v. *Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)).

The Second Circuit has held that "police officers, when making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed." *Martinez* v. *Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (citing *Singer*, 63 F.3d at 119); *see also Curley* v. *Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (holding that an arrest may be proper "[w]hen information is received from a putative victim ... unless the circumstances raise doubt as to the person's veracity" (citing *Singer*, 63 F.3d at 119)); *Miloslavsky* v. *AES Eng'g Soc., Inc.*, 808 F. Supp. 351, 355 (S.D.N.Y.

1992) ("The veracity of citizen complaints who are the victims of the very crime they report to the police is assumed." (citing *Adams* v. *Williams*, 407 U.S. 143, 146-47 (1972))).

A victim's identification of an alleged perpetrator alone may be sufficient to support probable cause.  *See, e.g.*, *Virgil* v. *Town of Gates*, 455 F. App'x 36, 38 (2d Cir. 2012) (summary order) ("A victim's identification of an assailant is, by itself, sufficient 'probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity.'" (citation omitted)); *Rizzo* v. *Edison, Inc.*, 172 F. App'x 391, 393 (2d Cir. 2006) (summary order) ("Both New York State and federal courts have held that a purported crime victim's identification of the alleged culprit will generally suffice to create probable cause to arrest." (citation and quotation marks omitted)); *Ackridge* v. *New Rochelle City Police Dep't*, No. 09 Civ. 10396 (CS), 2011 WL 5101570, at *1 (S.D.N.Y. Oct. 25, 2011) ("The victim's identification from a photo array is sufficient to provide probable cause to arrest." (citing *People* v. *Radcliffe*, 808 N.Y.S.2d 22, 23 (1st Dep't 2005))); *Parisi* v. *Suffolk County*, No. 04 Civ. 2187 (ENV), 2009 WL 4405488, at *7 (E.D.N.Y. Nov. 30, 2009) ("[P]robable cause for arrest has often been found by courts where only oral statements and descriptions were provided by the alleged victim."); *Thompson* v. *City of New York*, 603 F. Supp. 2d 650, 657 (S.D.N.Y. 2009) (granting summary judgment for defendant because the victim's "identification of [plaintiff] provided ample probable cause for [his] arrest"); *Smith* v. *City of New York*, 388 F. Supp. 2d 179, 185 (S.D.N.Y. 2005) (concluding that detective "had probable cause to

arrest [plaintiff] ... based on [the victim's] in-person identification of [plaintiff] and her description of the alleged rape").

Furthermore, officers are "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Martinez*, 202 F.3d at 635 (internal quotation marks omitted) (quoting *Ricciuti* v. *N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)); *accord Awelewa* v. *New York City*, No. 11 Civ. 778 (NRB), 2012 WL 601119, at *3 (S.D.N.Y. Feb. 23, 2012); *see also Koester* v. *Lanfranchi*, 288 F. App'x 764, 766 (2d Cir. 2008) (summary order) (concluding that an "officer is not required to eliminate every possible line of impeachment that might apply to a victim complainant" (internal quotation marks omitted) (quoting *Krause* v. *Bennett*, 887 F.2d 362, 372 (2d Cir. 1989))).  More fundamentally, the law is clear that "probable cause does not require absolute certainty." *Panetta*, 460 F.3d at 395 (citation and quotation marks omitted).

### iii.    What Constitutes an "Arrest"

The Fourth Amendment protects against unreasonable searches and seizures by the Government, including "brief investigatory stops of persons ... that fall short of traditional arrest." *United States* v. *Arvizu*, 534 U.S. 266, 273 (2002).  The Supreme Court has held, however, that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." *Terry* v. *Ohio*, 392 U.S. 1, 22 (1968).  A police officer may permissibly make an investigatory stop where the officer "has

reasonable suspicion supported by articulable facts that criminal activity 'may

be afoot,' even if the officer lacks probable cause." *United States* v. *Sokolow*,

490 U.S. 1, 7 (1989) (quoting *Terry*, 393 U.S. at 30); *accord United States* v.

*Cortez*, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by

some objective manifestation that the person stopped is, or is about to be,

engaged in criminal activity.").

"Of course, just as not every encounter between a citizen and the police

is a seizure, not every seizure is an arrest." *Posr*, 944 F.2d at 97-98 (internal

citation omitted).  "Whether an arrest supportable by probable cause occurs, as

distinct from a form of Fourth Amendment intrusion supportable by less than

probable cause, depends on the seizure's level of intrusiveness, and on the

corresponding degree of justification required to effect each level of

intrusiveness." *Id.* at 98.  It is therefore "not enough to say a person has been

*arrested* simply because, due to police action, he reasonably believes he is not

free to leave." *Id.* (emphasis in original).  On the other hand, "[i]f the totality of

circumstances indicates that an encounter has become too intrusive to be

classified as an investigatory detention, the encounter is a full-scale arrest, and

the government must establish that the arrest is supported by probable cause."

*Id.* (internal quotation marks omitted).  "The issue of precisely when an arrest

takes place is a question of fact," *id.* at 99, although a district court may decide

the issue of whether an arrest has been made where "there can be but one

conclusion as to the verdict that reasonable jurors could have reached,"

*Oliveira* v. *Mayer*, 23 F.3d 642, 645 (2d Cir. 1994) (citation and quotation marks omitted).

"There is no bright line rule differentiating an arrest from a detention supportable by less than probable cause." *Posr*, 944 F.2d at 98. "Whether a seizure is an arrest or merely an investigatory detention, depends on the reasonableness of the level of intrusion under the totality of the circumstances." *Id.* The "pertinent considerations" to consider when assessing whether an encounter between law enforcement and an individual is an arrest or an investigatory detention include:

> [T]he amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained,... and in particular such factors as the number of agents involved...; whether the target of the stop was suspected of being armed...; the duration of the stop...; and the physical treatment of the suspect..., including whether or not handcuffs were used.

*Oliveira*, 23 F.3d at 645 (citation omitted) (alterations in original).

### iv.   Qualified Immunity

"[Q]ualified immunity is 'an immunity from suit rather than a mere defense to liability.'" *Pearson* v. *Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell* v. *Forsyth*, 472 U.S. 511, 526 (1985)). "Under federal law, a police officer is entitled to qualified immunity where [i] his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or [ii] it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Jenkins* v. *City*

*of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (citations and quotation marks omitted).

At the time of Plaintiff's arrest, there was clearly a well-established right to be free from arrest without probable cause.  *See Martinez*, 202 F.3d at 634 (collecting cases).  Therefore, to the extent the Court reaches the issue of qualified immunity in relation to Plaintiff's false arrest claim, the officers' entitlement to it will turn on whether their probable cause determination was objectively reasonable.  "An officer's determination is objectively reasonable if there was arguable probable cause at the time of arrest — that is, if officers of reasonable competence could disagree on whether the probable cause test was met."  *Jenkins*, 478 F.3d at 87 (citation and quotation marks omitted); *see also Caldarola* v. *Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (stating that "in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity").

> **b.   Plaintiff's Voluntary Decisions to Accompany the Detectives to BSVS's Offices and to Participate in the Lineup Did Not Constitute an Arrest**

As noted, Plaintiff claims that he was falsely arrested when Sgt. Morrissey and Det. Murray picked him up from his home on the evening of July 12, 2010, and took him to BSVS's offices at the 77th Precinct for a lineup. Plaintiff points to the following details in support of this occurrence constituting an "arrest": (i) he was removed from his home; (ii) he was transported in a police vehicle to the precinct; (iii) he was secured in a room in

24

the precinct for "approximately one half hour" prior to the lineup (Keith Aff. ¶ 6);[13] (iv) Det. Murray observed in her deposition that Plaintiff "really didn't have a choice whether he was going to accompany" the officers (Murray Dep. 21); and (v) Plaintiff's assertion, made for the first time in connection with this motion, that he "went with the officers because I didn't feel that I had a choice" (Keith Aff. ¶ 5).  (*See* Pl. Opp. 9-11).  Next, Plaintiff argues that there was no probable cause for this purported arrest because, during her phone call to Det. Brown concerning her first identification of Plaintiff, the Victim told the detective only that Plaintiff "looked like" her attacker.  (*Id.*).

In response, Defendants argue that the officers had probable cause to arrest Plaintiff based on the Victim's "spontaneous identification of him as her assailant when she saw him on the street." (Def. Br. 5-6).  Moreover, they argue, Det. Brown understood the Victim's identification to be definitive — she told him she "saw her attacker," it was not a "maybe." (*Id.* at 6).  While the parties' dispute about the definitiveness of the Victim's first identification of Plaintiff may seem material at first blush, it is not.  Plaintiff's voluntary transport to the precinct was not an "arrest," and therefore the probable cause inquiry is not implicated.

---

[13]      It is undisputed that Plaintiff was picked up from his home for the lineup at about 10:00 p.m. on the evening of July 12, 2010 (Pl. 56.1 Opp. ¶ 35), and that his arrest after the lineup took place at 10:15 p.m. (*id.* at ¶ 50; Myrvold Decl. Ex. Q (Arrest Report)).  It is therefore unreasonable to infer that Plaintiff's estimate of having spent "approximately one half hour" locked in a room at the BSVS is correct.  *See Berk*, 380 F. Supp. 2d at 342 (finding that in deciding a motion for summary judgment, a court need not consider unreasonable inferences, or inferences at war with undisputed facts).

The record makes plain that no arrest took place prior to the lineup because Plaintiff consented to accompany the officers to the precinct and thereafter agreed to participate in the lineup.  *See Ackerson*, 702 F.3d at 19 (finding that to establish a claim for false arrest, one element the plaintiff must show is that he did not consent to the confinement).  When Sgt. Morrissey and Det. Murray went to Plaintiff's house, they asked him to come to the precinct. (Pl. 56.1 Opp. ¶ 36).  Plaintiff "was not cuffed" (Murray Dep. 20); he "got[] into the vehicle voluntarily and [went] with" the officers (*id.*); and there was no need for either force or restraint (*id.* at 22 (noting that Plaintiff "was a gentleman")). Plaintiff also consented to appear in the lineup.  (Keith Dep. 23 ("Q: And did you agree to participate in a lineup?  A: Yes."); *see also* Litwin Dep. 61 ("I understood that [Plaintiff] had come in voluntarily."); Myrvold Decl. Ex. N at DEF 729 ("suspect did consent to a line up")).  None of these facts is effectively disputed by Plaintiff.[14]

Even now, Plaintiff does not dispute that he gave his consent to the officers.  Instead, he argues that he gave such consent only because he felt that he was "not free to refuse to accompany the officers and/or not participate in the lineup." (*See* Pl. 56.1 Opp. ¶ 36).  This newly-minted argument, however, is predicated on two equally flawed premises.  First, Plaintiff relies on the speculative (and, as it happens, counterfactual) testimony of Det. Murray about

---

[14]     For example, in his Rule 56.1 Opposition Statement, Plaintiff purports to dispute that he was asked to participate in the lineup.  However, the evidence Plaintiff cites in support of this dispute does not actually contradict that Plaintiff was asked by the officers; instead, it just speculates that he may not have had a choice had he refused their request.  (*See* Pl. 56.1 Opp. ¶ 36).

what *might* have happened if Plaintiff had refused to participate.  (*See* Murray

Dep. 21).  Such ruminations are, of course, insufficient to create an issue of

material fact.  *See Knight*, 804 F.2d at 12 (holding that a party cannot rely on

"mere speculation or conjecture as to the true nature of the facts to overcome a

motion for summary judgment").  Next, Plaintiff relies on his affidavit, which

contradicts his prior sworn deposition testimony, was submitted after

Defendants moved for summary judgment, and cannot be used to create an

issue of material fact.  *See Mack* v. *United States*, 814 F.2d 120, 124 (2d Cir.

1987) (finding that the evidence established party's consent to urine test even

when late affidavit claimed fear of job loss and coercion, and holding that "[i]t is

well settled in this circuit that a party's affidavit which contradicts his own

prior deposition testimony should be disregarded on a motion for summary

judgment").

Even were the Court to accept Plaintiff's eleventh-hour reversal and

construe his consent as having been forced by the circumstances, his July 12

encounter with law enforcement at his home was at most an "investigatory

detention."[15]  The officers met Plaintiff at his home and requested that he

accompany them.  They used no force, and indeed none was necessary because

Plaintiff had given his consent.  Plaintiff's "freedom of movement," *Oliveira*, 23

F.3d at 645, was not restrained; he himself got into the officer's car and rode,

uncuffed, along with another officer in the back seat (*see* Keith Aff. ¶ 5).  *Cf.*

---

[15]     As the Court in *Posr* noted, "[I]t is not enough to say a person has been *arrested* simply
because, due to police action, he reasonably believes he is not free to leave."  944 F.2d
at 98 (emphasis in original).

*United States* v. *McCargo*, 464 F.3d 192, 199 (2d Cir. 2006) (finding that "where the police have a reasonable suspicion that a person was involved in a crime, they do not violate the Fourth Amendment rights of a suspect if they stop the suspect and transport him a short distance to the scene of the crime in furtherance of a legitimate law-enforcement purpose").  Plaintiff was then kept in a room for a brief period of time before the lineup.  None of these facts is disputed, and so this claim is appropriate for resolution on summary judgment.

Because the stop was merely an "investigatory detention," the officers needed only a "reasonable suspicion" that Plaintiff may have been involved in a crime, and indeed they had one.  Even adopting Plaintiff's construction of pre-lineup events, the Victim had spontaneously identified Plaintiff on the street as someone who "looked like" her attacker.  Such an identification has been found to support probable cause, and so it necessarily supports a finding of reasonable suspicion.  *See*, *e.g.*, *O'Brien* v. *City of Yonkers*, No. 07 Civ. 3974 (KMK) (LMS), 2013 WL 1234966, at *8-10 (S.D.N.Y. Mar. 22, 2013) (finding victim's spontaneous identification of plaintiff as robber 12 days after robbery supported probable cause, even where there were questions about victim's view of the suspect during the incident and victim offered differing descriptions); *People* v. *Palacio*, 503 N.Y.S.2d 56, 57 (1st Dep't 1986) (finding probable cause where witness unequivocally exclaimed that photograph "looked like" perpetrator).

Because Plaintiff voluntarily went to the BSVS with Sgt. Morrissey and Det. Murray and gave his consent to participate in the lineup, or, in the alternative, because his encounter with the BSVS prior to the lineup was an "investigatory detention" supported by reasonable suspicion, summary judgment is warranted as to Plaintiff's federal and state claims for false arrest, insofar as they implicate the period prior to his formal arrest.

### c.     Plaintiff's Arrest After the Lineup Was Justified by Probable Cause

According to Defendants, the Victim's identification of Plaintiff in the lineup gave Defendants additional probable cause to arrest him.  (Def. Br. 6-7). Plaintiff disagrees, asserting: (i) the Victim never made a positive identification of Plaintiff; (ii) even if she had, there were serious doubts about her veracity requiring further investigation; and (iii) there were "serious issues" with the lineup that tainted the Victim's identification.  (Pl. Opp. 6, 15).  Defendants retort that: (i) Plaintiff misconstrues the Victim's deposition testimony; (ii) there is no evidence that the Victim's veracity was in doubt; and (iii) there is no evidence that the lineup was unduly suggestive.  (Def. Br. 8-11; Def. Reply 1-5). As set forth herein, the Victim's second identification of Plaintiff during the lineup provided probable cause for his arrest.

### i.     The Victim Made a Positive Identification of Plaintiff During the Lineup

The record is clear that the Victim affirmatively identified Plaintiff during the lineup as her attacker.  Plaintiff argues against this proposition, asserting that when the Victim picked him in the lineup, she told police that he was

29

someone who "looked like" her attacker.  (Pl. 56.1 Opp. ¶ 48).  Defendants contend that Plaintiff is taking snippets of Victim's testimony out of context in attempt to create a material issue of fact, and that in any event, a victim's identification need not be made with complete certainty to give rise to probable cause.  (Def. Reply 1-2; Def. 56.1 Reply ¶ 48).  The Court agrees with Defendants; it will not draw unreasonable inferences in favor of Plaintiff from out-of-context excerpts of the Victim's testimony.

The Victim plainly stated, numerous times, that she gave police a clear identification: "I [said], 'That is the guy'" (Victim Dep. 26); "I [told] them, 'That is the person.  That is the person'" (*id.* at 43-44); and she testified that she told police she picked the person "[w]hat rape me" (*id.* at 48-49).  Her testimony as a whole also makes clear that, at the time she identified Plaintiff to police, she believed (and told police) that he was her attacker, but that she *now* understands that it really was not him and that he just "looked like" her attacker.  (*See, e.g., id.* at 26 ("I say, 'that is the guy.'  You know, it was really looking like him.  But it still come out it's not him.")).  In the overall context of the deposition, when the Victim used this "looking like" language in reference to the lineup identification, it is evident that she was implicitly acknowledging her present understanding that Plaintiff was not in fact her attacker — she was not actively describing the language she used when talking to the police.  Even when prompted by questioning at the very end of her deposition to agree that she told police that Plaintiff "looked like" the rapist, the Victim recalled affirmatively advising the police that "[t]hat is the person."  (*Id.* at 51).

Other record evidence confirms that this is the only reasonable reading of the Victim's testimony: Sgt. Morrissey and Det. Mathers, who conducted the lineup, testified respectively that the Victim was "definitive" in her identification (Morrissey Dep. 65), and that she "positively identified" Plaintiff (Mathers Dep. 20). Additionally, the summary of the lineup in police records describes the identification as follows: "[The Victim] did view said line up and identified the individual seated holding number six as her attacker." (Myrvold Decl. Ex. N at DEF 729). Taking the Victim's testimony and the record as a whole, no reasonable jury could find that the Victim did not affirmatively identify Plaintiff to the police during the lineup. And it is well-established that such an identification gives rise to probable cause. *See, e.g.*, *Virgil*, 455 F. App'x at 38. In any event, even if the Victim had told police that the individual holding number six "looked like" her attacker, that identification, too, could have given rise to probable cause. *See People* v. *Pelzer*, 982 N.Y.S.2d 316, 316 (1st Dep't 2014) ("[V]ictim's identification of defendant from a photo array need not be made with complete certainty to give rise to probable cause."), *leave to appeal denied*, 23 N.Y.3d 966 (2014).[16] At the very least, it would have given rise to arguable probable cause, bestowing Defendants with qualified immunity. *See Escalera*, 361 F.3d at 743.

---

[16]   The non-precedential cases Plaintiff cites for a supposedly contrary position are inapposite: for example, in one case the witness told the detective that the individual "would be" her assailant if he had different features (and, of necessity, that the individual was not her assailant); in another an identification was explicitly given with estimated 50-60% accuracy; and in others, the witness stated that the identified individual looks "more like" the perpetrator than other individuals in the array or lineup. (*See* Pl. Opp. 7-9).

## ii.     Defendants Were Not Required to Undertake Additional Investigation

Next, Plaintiff argues that, even if the Victim made a positive identification, "there were serious doubts to her veracity such that further investigation was required." (Pl. Opp. 6).  In support of this proposition, Plaintiff contends: (i) the Victim never got a "good look" at her attacker; (ii) the Victim had already made one erroneous identification of someone else; and (iii) the Victim had given police a description of her attacker that did not match Plaintiff.  (*Id.* at 8, 11).  None of these claims is borne out by the record.[17]

For starters, Plaintiff again takes the Victim's testimony out of context in asserting that she did not get a "good look" at her attacker.  (Pl. Opp. 14).  The victim unequivocally testified that she did get a "good look" at her attacker at some point during or after the assault: "Q: [] During the assault or after the assault, did you get a good look at this person?  A: Yes." (Victim Dep. 9).  The testimony on which Plaintiff relies relates to either (i) what the Victim saw during the rape (*see id.* at 14 (Q: Did you get a good look at the person's facial

---

[17]   Plaintiff endeavors to bolster his arguments in this regard by pointing out that Det. Litwin personally had serious doubts that Plaintiff was the rapist.  However, the probable cause inquiry is an objective one; an officer's subjective beliefs are immaterial to its determination.  *See Torraco* v. *Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 139 (2d Cir. 2010) ("The probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest, i.e., it is objective rather than subjective." (internal citation and quotation marks omitted)); *Curry* v. *Lynch*, 323 F. App'x 63, 65 (2d Cir. 2009) (summary order) ("The subjective beliefs of [arresting police officer] are wholly irrelevant to the question of whether probable cause justified [plaintiff's] arrest." (citing *Zellner* v. *Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007))); *Zahrey* v. *City of New York*, No. 98 Civ. 4546 (DCP)(JCF), 2009 WL 54495, at *18 (S.D.N.Y. Jan. 7, 2009) ("[A]s probable cause is an objective matter, the subjective opinions of police officers involved do not raise a fact issue to survive summary judgment." (citation and quotation marks omitted)), *amended on reconsideration in part*, No. 98 Civ. 4546 (DCP)(JCF), 2009 WL 1024261 (S.D.N.Y. Apr. 15, 2009).

features at the time of the assault?  A: No.… For what he was doing to me, I couldn't get a good look at all about that person.")), or (ii) what she told police (*see id.* at 15 ("Q: [] Did you tell the police that you didn't have a good look of the person?  A: No, I can't remember."), 22 ("Q: Now, again, did you tell the police … that you didn't get a good look at the person's face?  Did you ever tell them that?  A: I can't remember, no.… They ask me a lot of questions but, you know, I can't remember these things.")).  At no point in her deposition does the Victim express doubt that she could see her attacker well enough to identify him.  Moreover, even if the Victim had not acquired a "good look" at her attacker, she did not tell that to police.  And not getting a "good view" of an attacker does not necessarily negate probable cause, especially where a witness later affirmatively and without hesitation identifies a particular individual.  *See O'Brien*, 2013 WL 1234966, at *8-9 (finding probable cause for arrest based on in-person identification, and rejecting argument that officers should have doubted veracity, where witness previously told police he did not get "good view" of suspect and "told police that he would probably not be able to identify the suspect").

Plaintiff's contention that the Victim had previously identified another individual as her attacker, in reference to her having pointed out Buster Singleton in the photo array, is similarly incorrect.[18]  Plaintiff suggests that

---

[18]     Somewhat contradictorily, in his Rule 56.1 Statement in Opposition, Plaintiff purports to deny that the Victim noticed anyone at all during the photo array, stating, "According to the victim, at the photo array, she denied identifying anyone."  (Pl. 56.1 Opp. ¶ 21).  The portion of the Victim's testimony that Plaintiff cites in support simply does not say that.  (*See* Victim Dep. 15-16.)  And the pages following that portion indicate that the

Singleton "was identified as the rapist by the victim prior to Plaintiff's arrest, and an I-Card was created for him, which functions as an arrest warrant." (Pl. 56.1 Opp. ¶ 98). This prior identification, Plaintiff argues, should have been a red flag to officers that the Victim had a habit of inaccurate identifications.

However, even viewing the facts in the light most favorable to Plaintiff, there is no suggestion on the record that the Victim affirmatively identified Singleton as the rapist during the photo array or at any other time. The only conclusion that can be drawn from the record is that the Victim pointed out Buster Singleton in a photograph as someone who *resembled* her attacker. Indeed, even the evidence Plaintiff cites shows only that Brown identified Singleton as a "person of interest" based upon the Victim's statements and reactions during the photo array.[19]

Relatedly, Plaintiff argues that Defendants should have doubted the Victim's veracity because "she had given multiple physical descriptions, none of which matched Plaintiff." (Pl. Opp. 11). In point of fact, each of the physical descriptions provided by the Victim characterizes her assailant as a bald black male between 6'0" and 6'2", around 200 to 220 pounds, and in his 30s or 40s. At the time of his arrest, Plaintiff was a bald black male, 5'9" or 5'10" tall,

---

Victim did, in fact, pay particular attention to an individual in one of the photographs. (*See id.* at 15-17).

[19]   Additionally, although Plaintiff baldly asserts that an "I-Card ... functions as an arrest warrant" (Pl. 56.1 Opp. ¶ 98), selectively citing Brown's testimony, that characterization of an I-Card is incomplete and thus misleading. As noted, I-Cards can be issued regarding both suspects and witnesses. *See supra*, n.7. Moreover, Plaintiff ignores Brown's testimony that an I-Card is "not necessarily a warrant," and that instead it is something that allowed other officers "after doing a background check [to find] out that [Singleton] was wanted by [Brown's] office." (Brown Dep. 35).

34

around 170 pounds, and was 45 years old.  While he does not precisely fit the

parameters estimated by the Victim when describing her assailant on the day

of her attack, no reasonable jury would find that this calls into question the

Victim's truthfulness or veracity, or that it negates probable cause.

In offering her description on the day of her assault, the Victim was

estimating the appearance and size of a person who had overpowered her in

traumatic circumstances.[20]  Under those circumstances, that a victim might be

off by a few inches or several pounds is not surprising, and does not negate

probable cause in view of the Victim's two positive identifications of Plaintiff.

*See Stansbury*, 721 F.3d at 94 (finding arrest not illegal where totality of

evidence, including positive identification by witness, establishes probable

cause despite witness's prior description of perpetrator's height off by four

inches); *Pelzer*, 982 N.Y.S.2d at 316 ("The discrepancies between defendant's

appearance and the victim's description of the burglar were not so significant

as to undermine probable cause under the totality of circumstances."); *O'Brien*,

2013 WL 1234966, at *10 n.10 (finding that it was not "unreasonable that

[victim's] initial statements, given soon after the attack, slightly differ from

those later given to [d]etectives"); *Newton* v. *City of New York*, 640 F. Supp. 2d

426, 446 (S.D.N.Y. 2009) (noting that inconsistency in victim's information

---

[20]     When asked to gauge the strength of the Victim's description of the attacker's height,
weight, and age on the day of her attack, Brown stated, "I'm not really sure that anyone
can answer with any certainty.  She [was] not trained to … look at descriptions that
way, descriptions of people. … She provided me [a description] based on her
understanding … of a height of a person."  (Brown Dep. 46).  Brown went on to say,
"[T]his is her account on what happened.  You know, she suffered something that was
very traumatic, so I have no reason to doubt."  (*Id.* at 47).

could be explained by the "shock" of the attack itself, "rather than [by] deficient memory"); *Little* v. *City of New York*, 487 F. Supp. 2d 426, 439 (S.D.N.Y. 2007) (finding probable cause even where victims' description of perpetrators stated they "spoke in broken Spanish" and plaintiff, identified by victims, did not speak in broken Spanish; officers did not have to eliminate every theoretically plausible claim of innocence before making an arrest).  It is not as if the Victim identified someone of a completely different race, for example, or someone with long hair, or someone who was a teenager.

Not only does none of the purported deficiencies identified by Plaintiff call into question the Victim's veracity, but also none compares to circumstances where a victim's identification was found to be so unreliable as to not establish probable cause.  *See, e.g.*, *Albright* v. *Oliver*, 510 U.S. 266, 292 (1994) (Stevens, J., dissenting) (describing undercover informant whose false accusations led to more than 50 aborted prosecutions); *Mistretta* v. *Prokesch*, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998) ("The most common situation in which such doubts arise is when there exists a prior relationship between the victim and the accused that gives rise to a motive for a false accusation.  When such a relationship exists, and is known to the arresting officer before the arrest is made, the complaint alone may not constitute probable cause; the officer may need to investigate further."); *Roundtree* v. *City of New York*, 617 N.Y.S.2d 170, 171 (1st Dep't 1994) (finding witness's veracity suspect and probable cause lacking where investigating officer had serious doubts about accomplice's identification of plaintiff as the murderer, due to discrepancies in his statements, bloody

items found in his apartment, his sole access to the basement area where victim found, and knowledge that the witness had number of disputes with victim).

Thus, because the circumstances objectively did not merit doubting the Victim's reliability or veracity, Defendants were not required to conduct further investigation in order to establish probable cause after the Victim identified Plaintiff for a second time in the lineup.

### iii.   Plaintiff's Challenges to the Lineup Procedure Do Not Negate Probable Cause or Create a Material Issue of Fact

Plaintiff further argues that "serious issues" with the lineup are a "reason why police had a duty to investigate further and to find some, or even any, corroborating evidence, other than the victim's identification to charge plaintiff." (Pl. Opp. 15-16).  These issues, Plaintiff asserts, "cast doubt on whether the victim actually identified plaintiff." (*Id.* at 15).  Plaintiff first takes issue with the height difference between, on the one hand, the men featured in the lineup, who ranged from 5'9" to 5'11", and, on the other, the descriptions the Victim and Thomas gave of the attacker putting him between 6'0" and 6'2". As already discussed, these inches of difference do not undermine probable cause where there is a positive identification.[21]

---

[21]   Plaintiff also speculates as to the officers' motives in seating the individuals during the lineup, suggesting that they did so in order to "downplay" the "height issue" because they knew "that the victim's identification of her attacker was suspect." (Pl. Opp. 15-16).  The Court need not consider such unsubstantiated speculation in deciding the instant motion; had Plaintiff wanted to raise this as an issue of fact, he could have asked any of the NYPD personnel involved in the July 12 lineup as to their motivations in having the participants in the lineup sit down.

Plaintiff then takes issue with what the Victim was or was not told prior to the lineup.  Again, Plaintiff takes contradictory positions, neither of which is supported by the record.  First, Plaintiff disputes that Det. Litwin spoke to the Victim prior to the lineup, when he emphasized its importance and told her to be "very careful."  (*See* Litwin Dep. 18).  Instead, Plaintiff claims that the "victim testified that she did not speak to anyone before viewing the lineup." (Pl. 56.1 Opp. ¶ 46).  Simultaneously, Plaintiff argues that there is a factual dispute as to "whether the witness was compelled or coached to pick someone from the line up, in effect, tainting the line up."  (Pl. Opp. 17).  Plaintiff is only able to straddle these opposing positions by performing interpretive gymnastics with the testimony of a vulnerable and illiterate witness, who was sometimes imprecise with language and confused by counsel's questioning, and then taking her testimony out of context.  Plaintiff cannot manufacture a factual dispute in these circumstances.

Regarding Plaintiff's first argument, that the Victim did not speak to anyone: it is indisputably clear from the context of the deposition testimony cited by Plaintiff that the Victim believed that counsel was still asking her about what happened during her car ride to the lineup, not about what happened at the station prior to the lineup.  (*See*, *e.g.*, Victim Dep. 41-42 ("Q: Did you speak to anyone before you viewed the lineup?  A: No. … [I]t's more than one person, you know, [] it had one driving, one sitting in front of the seat and one was — I was in the back. … Because two of them was in the car and I was in the back.")).

38

Just a short time later in the deposition, the Victim actually did discuss what she was told once at the station, prior to the lineup.  (*See* Victim Dep. 46-51).  Plaintiff attempts to use this testimony in support of his argument that the Victim was somehow "coached."  This argument, too, falls when the Victim's testimony is considered in its totality.  When the Victim was asked clear questions on this topic, she responded unequivocally.

- "Q: So did anyone suggest to you that you should pick one person over another?  A: No, no, no."  (*Id.* at 46).

- "Q: Did any of the people that were there in the area where you were viewing the lineup do anything to indicate what person you should pick … in that lineup? A: No. No. No."  (*Id.* at 47).

- "Q: [] And did anyone suggest to you that you had to pick a person that was in there?  A: No.  I do it on my own."  (*Id.* at 49).

- "Q: But what I'm asking you is: did they tell you that the person who did it was definitely in the room?  A: Nobody didn't say that to me.  Never.  Never."  (*Id.*).

- "Q: [When] the officers brought you in and did they tell you that you had to choose one of these people?  A: No, they didn't."  (*Id.* at 50).

To be sure, the Victim responded to a few poorly-phrased questions with testimony suggesting that she was told to pick the person that assaulted her.  (*See*, *e.g.*, *id.* at 49 ("All they tell me, they have a lineup and they want me to show them who it is — say who it is do it.")).  However, read in context, her testimony is clear that she was not told she had to pick someone, but rather was instructed that *if* she saw the person who assaulted her, then she should pick that person.  At no point did the Victim suggest that she felt pressured or

coerced to identify one of the lineup participants as the perpetrator. *Cf.
Jenkins*, 478 F.3d at 93 (finding a potentially defective lineup where murder
witness testimony suggested coercion: "Because the detectives were, like, you
had to pick somebody. And I just wanted to go home and they were just, like,
forcing me to pick somebody.").

Nor does Det. Brown's summary of the lineup in the police
record — which states in part that "[The Victim was] asked to pick a number 1
through 6," "The suspect [had] chose[n] number 6," and "[The Victim] identified
the individual seated holding number six as her attacker" (Myrvold Decl. Ex. N
at DEF 729) — create a factual dispute on this issue. Reading the whole of the
record, it is clear that these notes were intended to capture the structure and
outcome of the lineup, and not to record any directions given to the Victim.
Thus, Plaintiff's allegations of a problematic lineup are unsupported by the
record, do not create an issue of material fact, and do not undermine probable
cause to arrest Plaintiff after the Victim identified him a second time during the
lineup. For all of these reasons, the Court grants Defendants' summary
judgment motion as to Plaintiff's federal and state false arrest claims.[22]

---

[22]    Even were the Court to have found actual probable cause lacking, it would nonetheless
        have found arguable probable cause established as a matter of law, thus entitling
        Defendants to qualified immunity. As noted, arguable probable cause exists where
        "(a) it was objectively reasonable for the officer to believe that probable cause existed, or
        (b) officers of reasonable competence could disagree on whether the probable cause test
        was met." *Escalera*, 361 F.3d at 743; *see also Zalaski* v. *City of Hartford*, 723 F.3d 382,
        390 (2d Cir. 2013) (affirming grant of summary judgment on basis of arguable probable
        cause). Here, the dispute among the detectives underscores the fact that officers of
        reasonable competence could — and here did — disagree on whether the probable
        cause test was met. *See also Betts* v. *Shearman*, 751 F.3d 78, 82-83 (2d Cir. 2014)
        (affirming grant of summary judgment of false arrest, false imprisonment, and
        malicious prosecution charges where police officers arrested plaintiff based on false

2. **The Court Grants Summary Judgment as to Plaintiff's Federal and State Malicious Prosecution Claims**

a. **Applicable Law**

Plaintiff also brings claims for malicious prosecution under both New York law and Section 1983.  As with false arrest, the standards under state and federal are nearly identical, except that to allege a cause of action for malicious prosecution under Section 1983, a plaintiff must allege, "in addition to the elements of malicious prosecution under state law, that there was [] a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights."  *Rohman* v. *N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000).

Involvement in a challenged arrest does not, standing alone, render an officer liable for malicious prosecution.  Instead, under New York law, liability for malicious prosecution can lie where a plaintiff demonstrates (i) the initiation or continuation of a criminal proceeding against plaintiff; (ii) termination of the proceeding in plaintiff's favor; (iii) lack of probable cause for commencing the proceeding; and (iv) actual malice as a motivation for defendant's actions.  *Manganiello* v. *City of New York*, 612 F.3d 149, 161 (2d Cir. 2010).  A plaintiff "demonstrate[s] that officers initiated criminal proceedings by having the plaintiff arraigned, by filling out complaining and corroborating affidavits, and

---

statements made by his then-wife, even though wife was intoxicated and had made prior false accusations).

Separately, having decided that Plaintiff has no constitutional claim here, the Court need not consider Defendants' arguments regarding the lack personal involvement of certain individual Defendants in Plaintiff's arrest.

by signing felony complaints." *Mitchel* v. *Victoria Home*, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006); *see also Manganiello*, 612 F.3d at 163 ("To initiate a prosecution, a defendant must do more than report the crime or give testimony. He must 'play[] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" (quoting *Rohman*, 215 F.3d at 217 (internal quotation marks omitted))).

As with a claim for false arrest, probable cause is a complete defense to a claim for malicious prosecution. *Manganiello*, 612 F.3d at 161-62 ("[T]he existence of probable cause is a complete defense to a claim for malicious prosecution in New York."). Notably, however, "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." *Stansbury*, 721 F.3d at 95; *see also Rounseville* v. *Zahl*, 13 F.3d 625, 629-30 (2d Cir. 1994) ("In the context of a malicious prosecution claim, probable cause under New York law is 'the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of.'" (quoting *Pandolfo* v. *U.A. Cable Sys. of Watertown*, 568 N.Y.S.2d 981, 982 (4th Dep't 1991))). The determination of probable cause in a malicious prosecution claim is "assessed in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of arrest." *Drummond* v. *Castro*, 522 F. Supp. 2d 667, 677-78 (S.D.N.Y. 2007) (collecting cases). Here, too, "identification of an individual as a perpetrator of a crime by a putative victim of, or eyewitness to, the crime is in itself sufficient to establish

probable cause, as long as it is reasonable to believe that the putative victim or eyewitness is telling the truth." *Rodriguez* v. *New York*, No. 95 Civ. 3639 (SHS), 1996 WL 197749, at *2 (S.D.N.Y. Apr. 23, 1996) (collecting cases); *see also Stansbury*, 721 F.3d at 90.

Because the Court has already found that there was probable cause to arrest Plaintiff, in order to prevail on his malicious prosecution claim, Plaintiff must show that the discovery of some intervening fact made the probable cause "dissipate" between the time of the arrest and the commencement of the prosecution. *Lowth*, 82 F.3d at 571 ("In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." (citing *Callan* v. *State*, 73 N.Y.2d 731 (1998))).

### b.    Analysis

After Plaintiff was arrested, and at the time he was presented for arraignment on July 13, 2010, he had been identified by the Victim twice: once spontaneously on the street, and again in the BSVS-organized lineup. As discussed above, the record discloses no reason for the officers to have doubted the veracity or reliability of the Victim's identifications of Plaintiff. After all, Plaintiff's appearance was consonant with, albeit not identical to, the Victim's original description of her attacker. Additionally, Det. Brown and the prosecutor drafted the complaint on which Plaintiff was arraigned in the company of the Victim after her second identification of Plaintiff.

With the clarity of hindsight, one can always point to facts, such as Det. Litwin's misgivings about the accuracy of the Victim's identification, as

indicators that further inquiry should have been undertaken.  But Defendants were not required to "investigate independently every claim of innocence," or "perform an error-free investigation."  *Baker*, 443 U.S. at 146.  The evidence that was known to Defendants at the time Plaintiff was arrested would, as a matter of law, have led a reasonably prudent person in like circumstances to believe that Plaintiff was guilty of the crimes charged.  And nothing changed in the period between Plaintiff's arrest and arraignment that made probable cause "dissipate."

Plaintiff's malicious prosecution claim also fails for lack of malice. "Under New York law, malice does not have to be actual spite or hatred, but only a showing 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *Lowth*, 82 F.3d at 573 (quoting *Nardelli* v. *Stamberg*, 406 N.Y.2d 500, 502-03 (1978)).  Plaintiff does not point to — and, indeed, the record is devoid of — any facts indicating that Defendants acted with the requisite malice to support a malicious prosecution claim.  Instead, Plaintiff renews his argument that Det. Litwin's subjective doubts about Plaintiff's guilt required Defendants to have undertaken additional investigation before arresting him.  This does not demonstrate malice.  *Rizzo*, 172 F. App'x at 393 n.1 (holding that the plaintiff's malicious prosecution claim also failed for a lack of malice, and explaining that the plaintiff's arguments as to what steps the officer could have taken to improve the investigation at issue "did not constitute evidence of malice").  Nor does Plaintiff's speculation — without a

44

scintilla of record evidence — that Defendants initiated the criminal prosecution for investigatory purposes support a finding of malice.  (*See* Pl. Opp. 25-26).

Because there was probable cause to prosecute Plaintiff and because Plaintiff has failed to establish that Defendants acted with malice, Defendants are entitled to summary judgment as to Plaintiff's federal and state malicious prosecution claims.[23]

### 3.   The Court Grants Summary Judgment as to Plaintiff's Federal Denial of Fair Trial Claim

#### a.   Applicable Law

A person suffers a violation of the right to a fair trial redressable under Section 1983 if an investigating official creates false information that is likely to influence a jury's decision, forwards that information to prosecutors, and the plaintiff is deprived of his liberty as a result.  *Ricciuti*, 124 F.3d at 130.  In contrast to a claim of false arrest or malicious prosecution, the existence of probable cause does not defeat a claim of fabrication of evidence.  *See id.* ("To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental

---

[23]   This Court's finding that arguable probable cause existed for Plaintiff's arrest, coupled with the absence of any evidence that "dissipated" that arguable probable cause before his prosecution, similarly requires a finding of qualified immunity as to Plaintiff's malicious prosecution claims. *See generally Betts*, 751 F.3d at 82-83.

Additionally, having decided that Plaintiff has no constitutional claim here, the Court need not consider Defendants' arguments regarding the lack personal involvement of certain individual Defendants in Plaintiff's prosecution.

justice."). Further, a plaintiff asserting a fair trial claim need not show he was convicted or that the case even went to trial. *See id.* at 127 (allowing claim to proceed despite the fact that all criminal charges were dismissed by court prior to trial).

### b.    Discussion

Plaintiff's denial of fair trial claim rests entirely on Plaintiff's factual assertion that the Victim never positively identified Plaintiff; Plaintiff argues that because the prosecutors were informed that the Victim had positively identified Plaintiff, that information was fabricated or misleading. (Pl. Opp. 32-33). As discussed above, Plaintiff's factual assertion that the Victim never positively identified Plaintiff is unsupported by the record; consequently, when the information regarding the identification was given to prosecutors — which, it bears noting, took place during a meeting at which the Victim was present — it was not false or fabricated.[24] Plaintiff's denial of fair trial claim must therefore fail.[25]

---

[24]    Plaintiff also asserts that Defendants should have informed the prosecutor of Det. Litwin's concerns about the identification, because had they known of these doubts they may have refused to prosecute or conducted their own investigation. (Pl. Opp. 34-35). First, this is mere speculation and does not defeat summary judgment. *See Gil* v. *County of Suffolk*, 590 F. Supp. 2d 360, 370 (E.D.N.Y. 2008) ("Any alleged failure to conduct further investigation ... does not amount to fraud, bad faith or the suppression of evidence."). Second, an officer's opinion is not evidence; not informing the prosecutor of one officer's subjective belief does not amount to a fabrication or suppression of evidence. Third, this assertion is nonsensical because Det. Litwin in fact informed the Kings County District Attorney's Office of his concerns and requested that the DNA analysis be expedited. (Pl. 56.1 Opp. ¶ 72).

[25]    Because the Court grants summary judgment as to Plaintiff's denial of fair trial claim, it need not decide whether individual Defendants are entitled to relief under the doctrine of qualified immunity.

### 4.      The Court Declines to Exercise Jurisdiction Over Plaintiff's Remaining State Law Claims

Finally, Defendants seek dismissal of Plaintiff's failure to intervene claim under New York law.[26]  This claim arises from the inmate assault that occurred while Plaintiff was in custody at Central Booking, and from the incidents that occurred during his transport to Rikers Island.  (*See* SAC ¶¶ 65-75).

Defendants argue that Plaintiff's failure to intervene claims against individual Defendants Brown, Morrissey, Gutierrez, Murray, and Mathers must be dismissed because "plaintiff has absolutely no proof that these detectives knew of the assault or were in a position to stop the assault."  (Def. Br. 20).[27] Plaintiff does not contest this argument in his opposition brief, nor does he provide any proof against the named individual Defendants.  Accordingly, summary judgment is hereby granted as to Plaintiff's state law failure to intervene claims against individual Defendants Brown, Morrissey, Gutierrez, Murray, and Mathers.  *See Gaston* v. *City of New York*, 851 F. Supp. 2d 780, 796 (S.D.N.Y. 2012) (dismissing claims where plaintiff "failed to respond or even mention [state law] claims in his opposition brief to defendants' summary judgment motion").

Instead, Plaintiff argues that, under state law, the City of New York can be held liable under the doctrine of *respondeat superior* for the failure of

---

[26]    Plaintiff has not specifically pled claims against the City of New York under *Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  Accordingly, the Court need not review Defendants' arguments for dismissal of such claims.  (Def. Br. 23-25).

[27]    *See Curley*, 268 F.3d at 72 (dismissing failure to intervene claim brought against officers because plaintiff had not shown that defendant was aware of or had an opportunity to intercede in use of excessive force).

unnamed corrections officers to intervene in Plaintiff's assault by inmates.  (Pl. Opp. 26-28).[28]  "'Having assumed physical custody of inmates, who cannot protect and defend themselves in the same way as those at liberty can, the state owes a duty of care to safeguard inmates, even from attacks by fellow inmates.'"  *Hartry* v. *County of Suffolk*, 755 F. Supp. 2d 422, 440 (E.D.N.Y. 2010) (quoting *Sanchez* v. *State of New York*, 99 N.Y.2d 247, 252-53 (2002)). However, this duty does not give rise to liability every time an inmate is attacked by a fellow inmate; the confinement of criminals together in tight quarters carries a certain amount of risk that cannot be eradicated.  *Id.* at 440-41.  Therefore, the scope of the duty to protect inmates is limited to harms that are reasonably foreseeable.  *Id.*; *see also Smith* v. *County of Albany*, 784 N.Y.S.2d 709, 711 (3d Dep't 2004).

In support of his claim, Plaintiff alleges that his attorney submitted a request that, due to the nature of the charges against him, Plaintiff be put in protective custody prior to his transport to Rikers Island.  (Pl. Opp. 27). Corrections officers failed to do so, and Plaintiff was put in a cell with approximately 25 other inmates, several of whom subsequently assaulted him. (*Id.*).  Plaintiff also points to his own deposition testimony that one officer

---

[28]    While under federal law municipalities cannot be held liable for the acts of their employees under the doctrine of *respondeat superior*, *see Pembaur* v. *City of Cincinnati*, 475 U.S. 469, 478 (1986), under state law municipalities can be held liable on such a theory, *see Holland* v. *City of Poughkeepsie*, 935 N.Y.S.2d 583, 589 (2d Dep't 2011) ("[U]nlike the claims pursuant to 42 U.S.C. § 1983, a municipality may be held vicariously liable for torts committed by its employee while acting within the scope of his or her employment."); *see also Williams* v. *City of White Plains*, 718 F. Supp. 2d 374, 381 (S.D.N.Y. 2010) (holding that state law tort claims survived summary judgment "due to the potential for vicarious liability for actions of its police officers as its employees").

stated that he should not be put on the transport bus to Rikers Island with inmates who had just assaulted him, but that another officer put him on the bus anyway.  (*Id.*).  These inmates spit on Plaintiff as they entered the bus.  (*Id.*).  Plaintiff argues that because his attorney had requested protective custody, and because corrections officers were aware of the nature of the charges against Plaintiff, the corrections officers were on notice that Plaintiff was likely to be assaulted and had a duty to intervene.  (*Id.* at 27-28).  Defendants do not respond to these arguments in any way.  Whether Plaintiff's assault was foreseeable by corrections officers presents questions of fact that cannot be resolved on the record currently before the Court; for example, it is unclear whether corrections officers were aware of Plaintiff's attorney's request that he be in protective custody.  The Court therefore cannot grant summary judgment as to these claims.

However, where a federal district court "dismisse[s] all claims over which it has original jurisdiction," that court has discretion over whether to exercise supplemental jurisdiction over the plaintiff's remaining state law causes of action.  28 U.S.C. § 1367(c)(3).  In determining whether to exercise that jurisdiction, district courts balance the *Cohill* factors of "judicial economy, convenience, fairness, and comity."  *Kolari* v. *N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (citing *Carnegie-Mellon Univ.* v. *Cohill*, 484 U.S. 343, 350 (1988)).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors … will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Pension Benefit Guar. Corp.*

49

*ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan* v. *Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (citation omitted).

The federal claims having been dismissed, this Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. The principles of judicial economy do not counsel in favor of the exercise of jurisdiction; indeed, very little discovery has been conducted in relation to these claims. There is no reason why convenience favors the resolution of these claims in federal court rather than New York state court. Fairness does not weigh in either direction, and the issue of comity weighs slightly in favor of New York State courts deciding New York state law claims.

## CONCLUSION

In resolving this motion, the Court does not mean to minimize the disruptions — personal, professional, and social — occasioned by Plaintiff's arrest. The fact remains, however, that a conceded victim of a brutal assault twice identified Plaintiff as the perpetrator of that assault, and on the record before this Court, the NYPD was permitted to rely on that identification. For all these reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Specifically, Defendants' motion for summary judgment as to Plaintiff's federal and state false arrest claims is granted, as to Plaintiff's federal and state malicious prosecution claims is granted, and as to Plaintiff's federal denial of fair trial claim is granted. These claims are accordingly dismissed with prejudice.

Defendants' motion for summary judgment as to Plaintiff's state law failure to intervene and *respondeat superior* claims is granted as to the individual Defendants and denied as to the City of New York.  However, the Court declines to exercise supplemental jurisdiction over these remaining state law claims.  Accordingly, Plaintiff's failure to intervene and *respondeat superior* claims against the City of New York are dismissed without prejudice.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      December 1, 2014
            New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge